# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 3:10-10 |
| ) | JUDGE KIM R. GIBSON |
| BARBARA PATTON, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

### I. SYNOPSIS

This matter comes before the Court on Defendant's Motion to Produce Evidence (Doc. No. 70) and Motion to Suppress Statements (Doc. No. 71), both of which the Government opposes. For the reasons that follow, the Court will **DENY** the motions.

### II. BACKGROUND

On March 16, 2010, Defendant was indicted on one count of embezzlement of monies or funds from a labor organization, in violation of 29 U.S.C. § 501(c). (Doc. No. 1). The Indictment charges that during her time as vice-president and president of the American Postal Workers Union, ALF-CIO, Local Union 4469 of Johnstown, Pennsylvania (the "Union"), Defendant embezzled $2,015.78 by charging unauthorized personal expenses to her Union credit card. (*Id.*). Defendant pleaded not guilty.

On November 14, 2011, Defendant filed the instant Motion to Produce Evidence (Doc. No. 70) and Motion to Suppress Statements (Doc. No. 71). Through these motions Defendant seeks to compel the Government to disclose any prior criminal acts and/or misconduct by Defendant that it intends to prove at trial, and to suppress as involuntary statements she made to investigators for the

1

United States Department of Labor on January 13, 2009. The Government filed its response to these motions (Doc. No. 82) on April 4, 2012, and a suppression hearing was held on May 14, 2012. (Doc. No. 85). At this hearing, the Government introduced into evidence: (1) the testimony of a single witness—Mary Ann Bowman, an investigator for the Department of Labor, Office of Labor Management Standards; and (2) a three-page written statement signed by Defendant. (Doc. No. 96). Defendant cross-examined Investigator Bowman, and a transcription of the hearing (Doc. No. 88) was produced. The parties subsequently filed their Proposed Findings of Fact and Conclusions of Law (Doc. Nos. 92 and 95), and the matter is now ripe for the Court's consideration.

## III. FINDINGS OF FACT

The Court makes the following findings of fact based on the evidence presented at the May 14, 2012 suppression hearing.

On October 23, 2008, Union officer George Selapack telephoned the Office of Labor Management Standards ("OLMS") to report that Defendant had placed personal charges on her Union credit card, which is a violation of Union policy. (Doc. No. 88 at 5). A criminal investigation was opened, and the case was assigned to Investigator Bowman. (*Id.* at 5; 24). Investigator Bowman subsequently met with the Union treasurer and reviewed financial records and credit card statements regarding the allegations against Defendant. (*Id.* at 5-6).

Investigator Bowman telephoned Defendant on January 6, 2009, identified herself as an investigator with the Department of Labor, and indicated that she would like the opportunity to come to Johnstown and speak with Defendant in person about her role as an officer for the Union and ask her questions regarding Union finances. (*Id.* at 6-7). Investigator Bowman confirmed that Defendant was taking down her name and contact information, but the call was disconnected before a time,

date, and place for the meeting was established. (*Id.* at 7; 31). Investigator Bowman did not call Defendant again after their first call was disconnected. (*Id.* at 30-31).

On January 13, 2009, Investigator Bowman, along with her co-worker, Investigator Sharon Skrabski, traveled to Somerset, Pennsylvania in an attempt to speak with Defendant at her residence. (*Id.* at 8). Defendant's adult son answered the door and informed Investigator Bowman that Defendant was at an auto repair facility. (*Id.* at 9). The investigators traveled to the repair facility, where Defendant was seated in the waiting room. (*Id.* at 10). Investigator Bowman approached Defendant, identified herself as an investigator with the Department of Labor, and confirmed Defendant's identity. (*Id.*). The investigators wore professional attire (i.e. plain clothes not uniforms), did not carry firearms, and showed Defendant their OLMS credentials. (*Id.* at 10; 37). Investigator Bowman explained that she was the investigator with whom Defendant had previously spoken by telephone and asked if Defendant would be willing to submit to a voluntary interview regarding her role as a financial officer with the Union. (*Id.* at 11; 41-42). Defendant indicated that she would be willing to meet with the investigators but wanted to have her vehicle repaired first; accordingly, Defendant suggested that they meet at a local Eat'n Park restaurant (the "Restaurant"). The investigators agreed. (*Id.* at 11).

The investigators drove to the Restaurant and waited in a booth for Defendant. (*Id.* at 12). Defendant arrived around the lunch hour, at which point the restaurant was busy, and sat at the opposite side of the booth from the investigators. (*Id.*). Investigator Bowman reminded Defendant that the interview was voluntary and the she did not have to participate if she did not wish to do so. (*Id.* at 13; 43). Investigator Bowman also explained that Defendant could stop the interview, take a break, or leave at any time. (*Id.* at 13). There were no questions by or discussions with Defendant

3

about her need for a lawyer, but OLMS procedure dictates that if the subject of an investigation asks whether an attorney is necessary, the investigator is to explain that it is a personal decision and the interview would end if the subject wished to consult an attorney. (*Id.* at 13-14).

The interview commenced with Investigator Bowman as the lead interviewer; both investigators took notes, but Investigator Skrabski did not ask any questions. (*Id.* at 14; 47). Investigator Bowman began by asking about Defendant's background and eventually transitioned to questions regarding her role in the Union and use of the Union credit card. (*Id.* at 14). Defendant made incriminating statements, including the admission that she had used her Union credit card for personal expenses. (*Id.* at 51-52). Additionally, Defendant discussed various stressors in her life—financial troubles, mental and physical health concerns, and personal problems. (*Id.* at 16; 50-51). Defendant also mentioned that she had previously told a counselor that she had "felt like putting a gun to her head," but explained that she did not presently feel suicidal and was continuing her sessions with the counselor. (*Id.* at 16-17).

The questioning of Defendant lasted approximately forty-five minutes to one hour, (*id.* at 47), and was conducted in a conversational tone with Defendant providing clear and concise answers. (*Id.* at 15-16). At its conclusion, Investigator Bowman indicated that she would like to prepare a written statement of Defendant's remarks. (*Id.* at 17). Investigator Bowman explained that the statement would provide Defendant "with the opportunity to let the Court hear her side of the story" and ensure that Investigator Bowman accurately recorded their conversation. (*Id.*). Investigator Bowman further explained that Defendant was not required to sign any statement that was produced. (*Id.*). Defendant then requested that the written statement be produced. (*Id.*).

With Defendant's input, the investigators prepared the written statement on a laptop

computer and printed it with a portable printer they brought to the Restaurant. (*Id.* at 17-18). Defendant reviewed the three-page statement, some handwritten changes were made to the typed document, and Defendant initialed above the changes. (*Id.*; see also Doc. No. 96). The investigators and Defendant signed the statement, and Defendant inquired as to what was "going to happen next." (Doc. No. 88 at 19). Investigator Bowman explained that she did not know, but would give the case to her supervisor who would determine how to proceed; she also gave Defendant her business card with instructions to call if she had any questions. (*Id.* at 19). Defendant then exited the restaurant. (*Id.*). No more than two hours had passed since the interview began. (*Id.* at 15; 47-48).

## IV. CONCLUSIONS OF LAW

The Court will address each of Defendant's motions in turn.

### A. Motion to Produce Evidence

Defendant requests that the Court, pursuant to Federal Rules of Evidence 404(b) and 609, compel the Government to provide her with a statement describing the criminal offenses or acts of misconduct other than those specified in the Indictment which the Government intends to prove at trial. (Doc. No. 70 at 1). The Court's Amended Pretrial Order requires the Government to produce such evidence of uncharged conduct on or before July 10, 2012. (Doc. No. 94 at 3). The Government indicates that it does not currently intend to introduce such evidence, but will comply with the Court's order should its intentions change. (Doc. No. 82 at 1-2). Accordingly, the Court will **DENY** Defendant's motion without prejudice and grant Defendant leave to file an appropriate motion if the Government ultimately fails to comply with the Court's order.

### B. Motion to Suppress

Defendant contends that the investigative tactics employed in this case were so coercive as to

5

render her confession involuntary and therefore inadmissible. (Doc. No. 71 at 12-14; see also Doc. No. 92 at 11-18).[1] As the United States Court of Appeals for the Third Circuit explained:

> The Supreme Court has made clear that a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991). In determining whether a statement is voluntary, Supreme Court precedent requires consideration of "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434, 147 L. Ed. 2d 405, 120 S. Ct. 2326 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973)). These surrounding circumstances include "not only the crucial element of police coercion, *Colorado v. Connelly*, 479 U.S. 157, 167, 93 L. Ed. 2d 473, 107 S. Ct. 515 (1986)," but may also include "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." *Withrow v. Williams*, 507 U.S. 680, 693, 123 L. Ed. 2d 407, 113 S. Ct. 1745 (1992) (some internal citations omitted).

*Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002); *Rhodes v. Winstead*, No. 2:05cv1515, 2010 U.S. Dist. LEXIS 22973, *5-6 (W.D. Pa. Mar. 9, 2010); see also *United States v. Lenegan*, 425 F. App'x 151, 153 (3d Cir. 2011) ("We evaluate the voluntariness of [a statement] based on the totality of the circumstances to determine whether 'the confession was the product of an essentially free and unconstrained choice by its maker, that it was the product of a rational intellect and a free will and that the [defendant's] will was not overborne.'") (quoting *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994)).

The crucial factor in this voluntariness inquiry is that of police coercion; a court will not hold that a confession was involuntary unless it finds that it was the product of "police overreaching." See *Swint*, 15 F.3d at 289 (citations omitted). While police officers may use psychological tactics in order to obtain a confession, the Court must ensure that the tactics employed "were not so

---

[1] While Defendant originally argued that these statements must also be suppressed because she did not receive *Miranda* warnings, (Doc. No. 71 at 4), she subsequently withdrew this argument. (Doc. No. 92 at 11 n. 3).

6

manipulative or coercive that they deprived [the suspect] of his ability to make an unconstrained, autonomous decision to confess." *United States v. Griggie*, 105 F. App'x 431, 425 (3d Cir. 2004) (quoting *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986)). Ultimately, the burden is on the government to prove by a preponderance of the evidence that a defendant's confession was given voluntarily under the totality of the circumstances. *Swint*, 15 F.3d at 289.

After considering the totality of the circumstances present in the case *sub judice*, the Court concludes without difficulty that the Government has met its burden. While the Court will address the characteristics of the accused and details of the interrogation below, "there is simply no evidence in the record to indicate any degree of coercion beyond the most basic police interrogation techniques." *Sweet v. Tennis*, 386 F. App'x 342, 348 (3d Cir. 2010).

### 1. Characteristics of the Accused

Turning first to the characteristics of the accused, the Court concludes that they support the finding that Defendant's statements were voluntary. Although her exact age is not presently before the Court, Defendant is a mature adult woman with adult children of her own. Similarly, while the Court was not informed of her specific educational background, she held leadership roles as a Union officer, serving as both its vice-president and president. Additionally, the record does not indicate that she suffered from any physical or mental conditions which would impair her ability to fully participate in the interrogation in question. Defendant did reference significant stressors in her life and the fact that she previously "felt like putting a gun to her head," but she further explained that she was continuing to seek counseling and was not suicidal at the time of the interview.

Overall, these characteristics paint the picture of mature, physically firm adult women with significant professional and personal responsibilities. While various stressors certainly had a taxing

7

effect on her emotional state, she received counseling and was of sound mind at the time of the interrogation.

### 2. Details of the Interrogation

The details of the interrogation itself also support the finding that Defendant's statements were voluntary. Investigator Bowman contacted Defendant to see if she would participate in an interview and answer questions regarding Union finances. Investigator Bowman further informed Defendant that her participation was not mandatory, but Defendant nevertheless agreed to participate and suggested that the meeting occur at the Restaurant. Defendant arrived at the Restaurant on her own accord, an interview was conducted in conversational tone, and the questioning was completed within one hour.

At the conclusion of the questioning, Investigator Bowman explained that she would like to draft a written statement memorializing the interview and informed Defendant that she did not have to sign any statement which was produced. Defendant requested that the statement be produced, participated in its drafting, and ultimately made revisions to the typed document before signing it. The total encounter—including both questioning and the production of the statement—lasted no more than two hours.

In sum, the circumstances surrounding the interrogation demonstrate appropriate investigative procedures and not police overreaching or coercive tactics. A brief and professional consensual interrogation was conducted, and a signed written statement was produced with Defendant's input and revisions. Defendant's will was not overborne nor were her statements coerced.

### 3. Specific Challenges Raised by Defendant

Defendant advances various unpersuasive arguments in an attempt to convince the Court that Defendant's statements were not voluntary. The Court will address each argument *seriatim*.

First, Defendant argues that the interrogation was unnecessary as Investigator Bowman believed she had sufficient evidence to prosecute Defendant without first obtaining a confession. (Doc. No. 92 at 12-13). But this argument misses the mark. Whether or not a conviction could have been obtained without a confession does not alter this Court's conclusion that Defendant participated in the interview of her own free will.

Next Defendant asserts that the OLMS investigators deceived Defendant into thinking that their inquiry was not criminal in nature and that their ultimate goal was to obtain a confession regarding the embezzlement of Union funds. (*Id.* at 13). Investigator Bowman, however, repeatedly informed Defendant that she worked for the Department of Labor and was conducting an official investigation into Union finances and Defendant's role as a Union officer. (See e.g. Doc. No. 96 at 1). The investigators also showed Defendant their credentials, including Department of Labor badges. Defendant's signed statement further indicates that she was on notice from the Union that criminal charges could be filed against her. (See Doc. No. 96 at 1-2).Thus, even if Investigator Bowman never specifically stated that it was a "criminal investigation," that implication was abundantly apparent. Moreover, the Court will not find an investigator's conduct to be coercive simply because she did not expressly inform the subject of an investigation that her goal was to obtain a signed confession.

Defendant also argues that the investigators employed coercive tactics including "deception, surprise, and ambush" by contacting Defendant at an auto repair facility unannounced and asking if

she would voluntarily submit to an interview. (Doc. No. 92 at 14). However, this unannounced encounter did not vitiate Defendant's free will or ability to decline the interview. In fact, Defendant subsequently selected the time and location of the interview to suit her schedule.

Defendant next claims coercion on the grounds that the interview was conducted between 8:30 a.m. and 3:00 p.m.—the time between when she finishes working a night shift at the Post Office and before she begins her second job at a Goodwill store. (Doc. No. 92 at 15). This argument fails for two reasons. First, the record does not establish that she worked both of these shifts on the date of the interview. Instead, the record establishes only that Defendant indicated she had to leave for work at 3:00 p.m. that day, not that she had worked the night before. (See Doc. No. 88 at 35-36; 48-49).[2] Second, the investigators only learned of Defendant's work schedule during the course of the interview itself. (*Id.* at 48). Despite Defendant's claim, the investigators simply did not schedule the interview to take advantage of the presumptively tired Defendant.

Defendant also argues that the details of the interrogation itself—i.e. its location, the types of questions asked, and the manner in which it was conducted—support the finding that her statements were involuntary. (Doc. No. 92 at 15-16). As discussed above at length, the interview itself and the investigative techniques employed were appropriate, not overreaching or coercive.

Defendant lastly contends that her statements were not voluntary in light of the personal characteristics the investigators uncovered during the interview, specifically the stress she was under and her mention of previous suicidal thoughts. (Doc. No. 92 at 16-17). The Court also addressed this issue above and stands by its prior conclusion that the sum of Defendant's personal characteristics

---

[2] Investigator Bowman testified at the suppression hearing that Defendant provided her general work schedule during the interview (a fact which was subsequently recorded in her report), but she was unable to recall if Defendant worked the night before the interview. Because Defendant presented no evidence establishing Defendant's work schedule on the date in question, this Court will not make the assumption that she did, in fact, work two jobs that day.

supports the voluntariness of her statements.

Therefore, after consideration of the totality of the circumstances, the Court finds that Defendant's statements were voluntary and not the product of coercion. Accordingly the Court will **DENY** Defendant's Motion to Suppress Statements (Doc. No. 71).

## V. CONCLUSION

For the above-stated reasons, the Court will **DENY** Defendant's Motion to Produce Evidence (Doc. No. 70) and Motion to Suppress Statements (Doc. No. 71). An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 3:10-10 |
| ) | JUDGE KIM R. GIBSON |
| BARBARA PATTON, ) | |
| ) | |
| Defendant. ) | |

## ORDER

**AND NOW**, this 25th day of June 2012, upon consideration of Defendant Barbara Patton's Motion to Produce Evidence (Doc. No. 70) and Motion to Suppress Statements (Doc. No. 71), and in accordance with the Memorandum Opinion, it is **HEREBY ORDERED** that the motions are **DENIED**.

BY THE COURT:

*/s/ Kim R. Gibson*

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**